FOX ROTHSCHILD LLP
Yann Geron
Kathleen Aiello
100 Park Avenue, 15th Floor
New York, New York 10017
(212) 878-7900

*Counsel to Richmond Valley Plaza,*
*LLC, A.E.T. Realty Holding Corp.,T.M. Real*
*Estate Holding LLC a/k/a T.M. Realty Holding*
*Corp., and E.B. Realty Holding Corp., Debtors*
*and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| RICHMOND VALLEY PLAZA, LLC, | : | Case No. 13-44040 (CEC) |
| | : | |
| Debtor. | : | |

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| A.E.T. REALTY HOLDING CORP., | : | Case No. 13-44043 (CEC) |
| | : | |
| Debtor. | : | |

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| E.B. REALTY HOLDING CORP., | : | Case No. 13-44047 (CEC) |
| | : | |
| Debtor. | : | |

------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 506, 541, 542, 543 AND 552, AND RULE 4001(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR ENTRY OF ORDER (A) DIRECTING TURNOVER FROM T.D. BANK OF DEBTORS' RENT RECEIPTS, (B) AUTHORIZING THE USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO T.D. BANK, AND (C) FOR AN ACCOUNTING OF ALL RENTS COLLECTED BY TD BANK, N.A.**

TO THE HONORABLE CARLA E. CRAIG,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), hereby file this motion (the "<u>Motion</u>") pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 506, 541, 542, 543, and 552 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure, for entry of an order: (A) directing turnover from T.D. Bank N.A. of Debtors' rent receipts, (B) authorizing the use of cash collateral and granting adequate protection to T.D. Bank, and (C) for an accounting of all rents collected by T.D. Bank, N.A.  In support of the Motion, the Debtors represent as follows:

<u>SUMMARY OF RELIEF REQUESTED</u>

1.      By this Motion, the Debtors seek authority regain control over and use their income, which is subject to the lien of T.D. Bank, N.A. ("TD Bank"), to fund their ongoing operations and to enable them to reorganize.   TD Bank must turn over to the Debtors all rents collected on the Debtors' leases, and must turn over control of the post-petition collection of such rents.  Further, absent approval of the Debtors' use of cash collateral, the Debtors would be unable to fund their operations and would be unable to meet their obligations as landlords under their tenants' leases, which comprise the source of all of the Debtors' revenue.  The Debtors' use of the cash collateral pursuant to the proposed enclosed budget will enable the Debtors to reorganize their operations while adequately protecting TD Banks' secured claim. Furthermore, the Debtors' continued operations and collection of rents post-petition will greatly enhance their going concern value and their ability to successfully reorganize.

<u>JURISDICTION AND VENUE</u>

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicate for the relief requested in this Motion is 11 U.S.C. §§ 105, 361, 363, 364, 506, 541, 542, 543 and 552 and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.     The Bankruptcy Cases

4.     On June 28, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of New York (the "Court").

5.     The Debtors continue to operate their business and manage their property as a debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  To date, no trustee, examiner or statutory creditors' committee has been appointed in the Debtors' chapter 11 cases (the "Cases").

### B.     The Debtors' Operations and Debt Structure

6.     The Debtors own real property located in Staten Island, New York, which they have developed, or are in the process of developing, into revenue-generating commercial properties.  More specifically, the Debtors own several parcels of real property known as Page Avenue and Richmond Valley Road, Block 7580, Lots 1, 3 & 5, Staten Island, New York 10309 ("Lots 1, 3 & 5"), and an adjacent property located at Page Avenue and Richmond Valley Road, Block 7580, Lot 80, Staten Island, New York 10309 ("Lot 80" and together with Lots 1, 3 & 5, the "Properties").

7.     Pursuant to the Mortgages (defined below), TD Bank has liens on the cash the Debtors receive from the Leases (the "Cash Collateral").  By letter to Debtors' counsel, dated

July 1, 2013, TD Bank advised the Debtors that TD Bank does not consent to the Debtors' post-petition use of TD Bank's cash collateral.

### (i)    Richmond Valley Plaza

8.    The Richmond Valley Plaza shopping center is situated on Lots 1, 3 & 5, which is owned by Debtors A.E.T. Realty Holding Corp. ("AET"), E.B. Realty Holding Corp. ("EB") and Richmond Valley Plaza LLC ("RVP"), collectively.  Richmond Valley Plaza is fully rented to premier commercial tenants, with an approximate annual rent roll of $764,198.56 (triple net). The respective leases (the "Leases") with RVP's tenants are held by the specific Debtor which holds title to that Lot.

9.    Lots 1, 3 & 5 are subject to three consolidated mortgages held by TD Bank, which were extended and modified pursuant to a Mortgage Modification Agreement made by and between RVP, EB, AET and TD Bank on or around June 10, 2009, to form a new single secured note and mortgage in the principal amount of $5,670,000 (the "Lots 1, 3 & 5 Mortgage").

10.    By assignment dated on or about October 4, 2006, the Debtors gave TD Bank an Assignment of Leases and Rents as additional security for payment of the debt and performance of the obligations in connections with the Lots 1, 3 & 5 Mortgages.

11.    In or around November 2008, CBRE appraised Lots 1, 3 & 5 at approximately $8.4 million upon completion or stabilization of the property in or around September 1, 2009. Lots 1, 3 & 5, also known as "Richmond Valley Plaza," are now fully developed and fully rented.

12.    More recently, Cushman & Wakefield, Inc. performed an appraisal of the property on behalf of Cantor Commercial Real Estate, LP, dated February 11, 2013, valuing Lots 1, 3 and 5 at $11.1 million. Cushman performed this appraisal in connection with the Debtors'

pre-petition efforts to refinance TD Bank's mortgages on Lots 1, 3 & 5. A copy of the Lots 1, 3 & 5 appraisals are attached as Exhibits A and B[1], respectively.

13.    RVP, EB and AET were unable to pay off the Lots 1, 3 & 5 Mortgage by its maturity date.

14.    On or around October 27, 2011, TD Bank filed an action in the Supreme Court of the State of New York, County of Richmond (the "State Court"), which captioned is styled *T.D. Bank, N.A. (Successor by Merger to Commerce Bank/North) v. Richmond Valley Plaza, LLC, A.E.T. Realty Holding Corp., E.B. Realty Holding Corp., T.M. Realty Holding Corp., John Noce, Alice Noce, Joseph Noce, Lisa Noce, Antonio Mandara, Lisa Mandara, Augusto Mandara, Guiseppina Mandara, Emilio Branchinelli, Judy Branchinelli, Board of Managers of the Shopowners Association, The New York State Department of Taxation and Finance, The New York City Department of Finance and John Doe #1 through John Doe #10,* (Index No. 130847/2011), which is pending before the Honorable John A. Fusco, J.S.C.

15.    On July 5, 2012, the State Court entered an Order Appointing Receiver in Mortgage Foreclosure Action, wherein Michael V. Ajello, Esq. (the "Receiver") was appointed temporary receiver, for the benefit of TD Bank, of all rents, profits and other revenue of Lots 3 and 5.

16.    Prior to the pre-petition appointment of the Receiver, each of the Debtors collected rents from their respective tenants and deposited all these funds into RVP's bank account. RVP managed the consolidated cash and made disbursements on behalf of itself and

---

[1]    Debtors reserve their rights to update any and all appraised values.

the other Debtors.[2]  Upon his appointment, the Receiver assumed responsibility for collecting the

Debtors' rents.

17.    On October 23, 2012, the Receiver advised the State Court that he could no longer

act as the Receiver.  At that time, the Debtors and TD Bank were actively engaged in settlement

discussions, and the parties appeared near agreement.  The parties actively discussed whether

and how to address the Receiver's discharge.  Because of the ongoing settlement negotiations,

the Debtors believed that any arrangement governing the collection of rents on the Leases

following the Receiver's removal would be short-term, and that the Debtors would shortly be

regaining control of Lots 1, 3 and 5 and the rents collected from the Leases.

18.    On or around December 2012, the Receiver, TD Bank, and each of RVP, AET,

EB and TM entered into a Stipulation and Order Discharging Receiver (the "Stipulation"), which

provided that TD Bank would collect directly from the Debtors' tenants all rents, additional rents

and other amounts due and payable under the Leases, and that TD Bank would apply all such

collections towards the Debtors' obligations to TD Bank.  A copy of the Stipulation is attached

as Exhibit C.  The Stipulation further provided that RVP, AET, EB, and TM "shall (i) maintain

[Lots 1, 3 & 5], and the improvements thereon, in good operating order and condition as required

by the subject mortgages; (ii) pay any and all taxes with respect to [Lots 1, 3 & 5] as required by

the subject mortgages.  See Stipulation, ¶ 5.

19.    Pursuant to the terms of the Stipulation, in or around December 2012, TD Bank

took control of all proceeds from the Leases, while the Debtors agreed to pay all expenses to

maintain Lots 1, 3 & 5.  Because the only revenue earned by RVP, AET, EB, and TM is the

income stream from the Leases, Tottenville Commons LLC, a non-debtor affiliate of the Debtors,

---

[2]      Each of the Debtors transferred all rent deposits to RVP in payment of operational expenses for Richmond

and the members and shareholders of the Debtors personally, paid the maintenance for Lots 1, 3 and 5 while TD Bank, on behalf of RVP, AET, EB, and TM, collected all the rents.  Again, this arrangement was intended by the Debtors as an interim measure pending what had appeared to be imminent settlement between the Debtors and TD Bank.  Regrettably, that settlement was not achieved.

20.    On or around May 6, 2013, TD Bank obtained an Order and Judgment of Foreclosure and Sale with respect to Lots 1, 3 & 5, which was recorded by the Richmond County Clerk on May 15, 2013.  The Lots 1, 3 & 5 Foreclosure Order indicates that the amount owed TD Bank on account of the Lots 1, 3 & 5 Mortgages is approximately $6,332,792.63.

(ii)    **Lot 80**

21.    Lot 80 is adjacent to Lots 1, 3 & 5 on Page Avenue.  Lot 80 is being developed by the Debtors as a 70,000 square foot shopping center, which the Debtors estimate will be completed in approximately one to two years.  This estimated completion period includes obtaining certain necessary approvals from the City Planning Board.

22.    On or about January 27, 2012, CBRE appraised Lot 80 "as is" at approximately $10.9 million.  A copy of the Lot 80 Appraisal is attached as Exhibit D.

23.    Lot 80 is subject to a separate mortgage held by TD Bank in the principal amount of $7.93 million (the "Lot 80 Mortgage" and together with the Lots 1, 3 & 5 Mortgage, the "Mortgages").

24.    On or around August 17, 2011, after TM could not satisfy the Lot 80 Mortgage by its maturity date, TD Bank filed an action in the Supreme Court of the State of New York, County of Richmond, which captioned is styled *T.D. Bank, N.A. (Successor by Merger to*

---

Valley Plaza.

*Commerce Bank/North) v. TM Real Estate Holding, LLC, John Noce, Alice Noce, Joseph Noce,*

*Lisa Noce, Antonio Mandara, Lisa Mandara, Augusto Mandara, Guiseppina Mandara, Emilio*

*Branchinelli, Judy Branchinelli,Richmond Valley Plaza, LLC, A.E.T. Realty Holding Corp., E.B.*

*Realty Holding Corp., T.M. Realty Holding Corp. and The Stop & Shop Supermarket Company*

(Index No. 130668/2011), which is also pending before the Honorable John A. Fusco, J.S.C.

25.     On or around April 15, 2013, TD Bank obtained a judgment and order of foreclosure with respect to Lot 80, which was recorded by the Richmond County Clerk on or around May 1, 2013.  Lot 80 was noticed for auction sale on July 10, 2013.  This foreclosure sale was stayed by virtue of the Debtors' bankruptcy filings.

## RELIEF REQUESTED AND BASIS THEREFOR

26.     The Debtors seek (a) entry of an order (the "Order"), attached as Exhibit E:  (A) directing turnover from T.D. Bank N.A. of Debtors' rent receipts, (B) authorizing the use of cash collateral and granting adequate protection to T.D. Bank, and (C) for an accounting of all rents collected by T.D. Bank, N.A.

**A.  Turnover of the Rents Receipts From TD Bank is Warranted**

27.     There can be no dispute that the rents from the Tenants constitute property of the Debtors' estate pursuant to Section 541 of the Bankruptcy Code.  Therefore, pursuant to Section 542 of the Bankruptcy Code, TD Bank is required to turn over such rents to the Debtors, and to the extent TD Bank was or purports to continue to act as a custodian of these rents, it is required to turn over the rents to the Debtor pursuant to Section 543 of the Bankruptcy Code.

28.     The Stipulation, which placed pre-petition control of the rents in the exclusive hands of TD Bank, does not preclude this relief.  The Debtors' regaining of control and use of their rent collections post-petition is appropriate, even if those rents were being collected by a

secured lender or receiver pre-petition. *See In re South Side House, LLC*, 474 B.R. 391, 411-12 (Bankr. E.D.N.Y. 2012) (finding that single asset debtor had sufficient pre-petition interest in rents from mixed-use commercial property to constitute cash collateral, notwithstanding foreclosure action commenced by secured lender and pre-petition appointment of receiver).

29.    In <u>South Side House</u>, this Court held that tenant rents were property of the Debtor's estate, and that under New York's "lien" theory of mortgages, title to the debtor's property or the income generated thereon does not transfer to the mortgagee. *Id. at 403.*  The Court held that the right to collect rents is not the same has possessing title to collect rents.  The Court reached this conclusion notwithstanding that the mortgagee had already commenced a foreclosure action and that a pre-petition receiver was collecting tenant rents for the benefit of the mortgagee. *Id. at 404.*  In fact, the Court noted that the majority of New York State cases have held that an absolute assignment of rents is not permitted or enforceable, regardless of the language in the agreement. *Id. at 403.*  This Court further held that although the Lender had an enforceable interest in the rents, the Debtor retained a prepetition interest in the rents sufficient to bring them in as property of the estate, which this Court acknowledged has a broad and far-reaching definition. *Id. at 411-412.*[3]

30.    The Debtors in the present case are in the same position post-petition as the Debtor was in <u>South Side House</u>.  Here, TD Bank commenced the foreclosure action pre-petition based on the Debtors failure to pay off the Lots 1, 3 & 5 Mortgage at maturity, appointed a Receiver to collect rent from the Debtors' tenants, of which TD Bank later took control when the

---

[3]    The Court also recognized that the rents are the Lender's cash collateral and provided that the Debtor could show that the Lender was adequately protected by meeting the standards set forth in Sections 361, 363 and 552 of the Bankruptcy Code, then the Debtor's use of the cash collateral was permissible while the cash collateral order remained effective, notwithstanding the Lender's objection. *See In re South Side House, 474 B.R. at 412.*

Receiver stepped down.  However, such control does not give TD Bank title to collect the tenant rents post-petition since the rents remain property of the Debtors' estates under Section 541 of the Bankruptcy Code.  Much like the Debtor in <u>South Side House</u>, the Debtors here must be permitted to regain control of their rent collections and to use the rents as cash collateral.

31.    Therefore, TD Bank must be directed to turn over to the Debtors the rents collected from the tenants on Lots 1, 3 and 5, and to allow the Debtors to collect all such rents post-petition.  The Debtors hereby preserve their rights against TD Bank  to the extent TD Bank acted pre-petition in accordance with the Stipulation to credit rents collected to the Debtors' obligations to TD Bank.

**B.**    <u>**The Proposed Use of Cash Collateral Is Appropriate and Should Be Authorized**</u>

32.    Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral, and provides, in pertinent part that:

> [t]he trustee may not use, sell, or lease cash collateral … unless –
> (A) each entity that has an interest in such cash collateral consents;
> or (B) the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this section.

<u>11 U.S.C. § 363(c)(2)</u>.

33.    Section 105(a) of the Bankruptcy Code also allows that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  <u>11 U.S.C. § 105(a)</u>.

34.    The Debtors' proposed use of Cash Collateral is necessary to preserve their assets and property (including the Properties) during these Cases, and will avoid immediate and irreparable harm to the Debtors' estates and their creditors, including TD Bank.

35.     Specifically, the Debtors propose to use all rental proceeds derived from the Leases to maintain the Properties by paying utilities, maintenance, upkeep, and other current

operating and reorganization costs while these Cases are pending.  Such use prejudices no one; it affirmatively and directly benefits the estates and creditors by enhancing the prospects of a successful outcome of these Cases.

36.      Based on their obligations under the Leases, historical expenses, and the estimated administrative expenses of their chapter 11 Cases, the Debtors submit the enclosed proposed budget for their use of the Cash Collateral (the "Budget").  A copy of the Budget is attached as Exhibit F.    As detailed in the Budget, the Debtors propose to follow their pre-petition cash management by consolidating all rent collections into the RVP DIP account and to use the proceeds to pay only the estate expenses detailed in the Budget, subject to a 10% variance to allow for reasonable business requirements.

37.      The pre-petition Stipulation between the Debtors and TD Bank, which removed the Receiver and put TD Bank in control of all of the Debtors' rent collections, was a short-term measure during settlement discussions.  That is the only reason why the Debtors agreed to have a non-debtor third party, or their members and shareholders personally, pay carrying costs on the properties while allowing TD Bank to collect all rents.  This arrangement, under which TD Bank gets all the income while the Debtors' principals fund all costs, was clearly not a long-term arrangement, and in any event is not tenable or sustainable post-petition.

38.      The relief sought by this Motion will allow the Debtors to regain control of their own rents, which are indisputably property of the Debtors' estates, and to use such rents in accordance with the Budget and for the benefit of all creditors, including TD Bank.

39.      The only alternative to the relief sought by this Motion would be for the Debtors to obtain credit from a non-debtor under Bankruptcy Code sections 361, 362, 363, and 364, upon

permission from the Court.   Seeking debtor-in-possession financing in these cases would add unnecessary and unwarranted layers of expense and complexity.

40.    Moreover, additional debt on the Debtors' properties is entirely unnecessary.   The Budget, Lease revenues, and appraised values of the Debtors' real property demonstrate that TD Bank's secured position is adequately protected.   First, the values of the Debtors' properties greatly exceed the amount of TD Bank's secured claims.   Specifically, as detailed above, Lots 1, 3 and 5 were recently appraised at approximately $11,100,000, while TD Bank's pre-petition judgment is approximately $6,330,000[4].   The Debtors have accrued unpaid real estate taxes totaling approximately $90,000.   Therefore, TD Bank's secured claim has an "equity cushion" of approximately $4,680,000[5].

41.    Second, the Debtors' proposed Budget specifically provides for the Debtors' use of rents to pay the costs of maintaining the Properties, which will serve to further protect TD Bank against any diminution in the value of its collateral.

42.    Third, as detailed below, the Budget provides for adequate protection payments to be made by the Debtors to TD Bank from the rents collected.

43.    Fourth, the proposed Order provides for additional protections to TD Bank in the form of replacements liens and reporting requirements.

44.    Plainly, TD Bank has no cause or reason to continue to collect the Debtors' rents post-petition, and the Debtors must be allowed to regain control of those rents to ensure the proper operations of their Properties post-petition.   TD Bank's secured claim will not be

---

[4]    As noted, TD Bank has been collecting the Debtors' rents since approximately December 2012, and applying such collections to the Debtors' obligation to TD Bank.   Accordingly, the judgment amount may be reduced by any credits due the Debtors.

[5]    Debtors reserve their rights with respect to the amount of TD Bank's claim and to the appraised value of their Properties.

diminished by this relief, and indeed, is amply protected by the value of the Properties and under the proposed Budget.

45.     Therefore, the Debtors must be allowed to regain the use of the rents and to use the rents in accordance with the Budget.

**(i)     The Proposed Adequate Protection is Appropriate**

46.     Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

47.     Section 361 of the Bankruptcy Code provides examples of adequate protection, which include, but are not limited to: (1) "periodic cash payments" to the extent that such use "results in a decrease in value of such entity's interest in the property"; (2) "additional or replacement lien[s] to the extent that the use [of cash collateral] will cause a decrease in the value of such entity's interest in the property"; and (3) "granting such other relief … as results in the realization by the entity of the indubitable equivalent of such entity's interest in the property." 11 U.S.C. § 361.

48.     Bankruptcy courts have broad flexibility under section 361 in deciding what constitutes adequate protection:

> This section specifies the means by which adequate protection may be provided.  It does not require the court to provide it.  To do so would place the court in an administrative role.  Instead, the trustee or debtor in possession will provide or propose a protection method.  If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate.  The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.").

49.    The principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest. *See Swedeland Dev. Group*, 16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)); *accord In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."); *In re Hollins*, 185 B.R. 523, 528 (Bankr. N.D. Tex. 1995) ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral . . . .").

50.    However, Courts are "not obligated to protect the creditor better than it did itself when making the loan and obtaining security." *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). The interest to be protected by virtue of the adequate protection requirement is the lesser of the amount of the debt or the value of assets securing the debt as of the Petition Date. *See In re Alyucan Interstate Corp.*, 12 B.R. 803, 808 (Bankr. D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien.").

51.    Here, the value of TD Bank's lien is more than adequately protected by the value of Lots 1, 3 and 5, as evidenced by the appraisals. Moreover, the proposed Budget not only provides for the maintenance and operation of Lots 1, 3 & 5 (thereby further protecting TD

Bank's lien), but also goes one step further to safeguard TD Bank's interest in the Properties by providing for periodic payments to be made to TD Bank.

52.     In essence, therefore, TD Bank's lien is protected by three different layers; each on its own would be deemed adequate.  Clearly, all three together is unquestionably more than adequate.

**(ii)     The Proposed Budget Will Allow the Debtor's to Maintain the Properties Thereby Adequately Protect the Interests of TD Bank**

53.     As noted, even in the absence of any payments post-petition to TD Bank, the value of Lots 1, 3 and 5, alone would provide for adequate protection for TD Bank's secured claim.

54.     The Debtors' Budget provides a second level of adequate protection to TD Bank. As a threshold matter, the Budget provides for expenditures to fund the Debtors' necessary and essential day-to-day operations.  Such expenditures include payments required to maintain the Properties, including electric for common areas and parking lots, property taxes, water for the common areas and sprinklers in the parking lots.  (As separately detailed below, the Budget also provides for adequate protection payments to TD Bank in the form of interest-only payments[6] on account of TD Bank's pre-petition judgment claim.)

55.     Courts have routinely held that adequate protection may be demonstrated by a showing that the going concern value of a debtor, or that the value of the lender's collateral, is preserved by the debtor's continued operations and use of cash collateral.  *See, e.g., In re JKJ Chevrolet, Inc.*, 117 F.3d 1413, 1413 (4th Cir. 1997) (allowing use of cash collateral to operate

---

[6]     This amount may be adjusted if such claim has been reduced by TD Bank's collection and application of rent collections to its claim since implementation of the December 2012 Stipulation.

automobile dealership as long as continued operations maintained the value of the business); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1087 (4th Cir. 1986) (allowing use of cash collateral to operate ski resorts where trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on collateral property); *In re Constable Plaza Assocs.*, L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

56.    Here, the cash expenditures proposed in the Budget will directly serve to preserve and maintain the pre-petition value of TD Bank's secured claim.

57.    Moreover, use of the Cash Collateral consistent with the Budget will maintain the overall value of the Debtors' ongoing enterprises and enhance the chances of a successful outcome for the Cases.  By preserving, and even enhancing, the value of the Debtors' properties post-petition, the Debtors will be able to explore take-out financing and other reorganization options which will allow for the successful conclusion of these cases.

58.    If the Debtors are precluded from making expenditures necessary to maintain their assets and conduct operations in the ordinary course, the Debtors' estates will lose considerable value and all creditors — secured and unsecured — will be harmed.  *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citing *In re Grant Broad. of*

*Philadelphia, Inc.*, 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987), *aff'd*, 75 B.R. 819 (E.D. Pa. 1987), and *In re Alyucan Interstate Corp.*, 12 B.R. at 809-12).

**(iii)    The Budget Provides for Direct Payments to TD Bank**

59.    In addition, allowing for the maintenance of the Debtors' operations, the Budget also provides for payments to be made to TD Bank.  Periodic cash payment of interest at the pre-petition contract rate is a generally accepted form of adequate protection.  *See* 11 U.S.C. § 361(1); *see also In re Swedeland Dev. Group, Inc.*, 16 F.3d at 5-6 (observing that cash payments constitute a form of adequate protection under section 361 of the Bankruptcy Code); *Matter of Crockett*, 3 B.R. 365, 368 (Bankr. N.D. Ill. 1980) (payment of interest accepted as a form of adequate protection).

60.    As mentioned above, notwithstanding TD Bank's significant equity cushion, the Debtors propose to make payments to TD Bank pursuant to the Budget.  Specifically, the Budget provides for payments to be made to TD Bank at the contract rate of interest on the amount due on TD Bank's foreclosure judgment against the Debtors, all without prejudice to the Debtors' rights to object to the amount of TD Bank's claim once TD provides its accounting as to the rents it has collected and applied under the Stipulation.

**(iv)    The Proposed Order Requires the Debtors to Provide Continued Financial Reporting to the Prepetition Lenders**

61.    Continued financial and other reporting as required by the Order is often a component of the adequate protection provided to secured creditors.  *See, e.g.*, *In re 5877 Poplar*, L.P., 268 B.R. 140, 150 (Bankr. W.D. Tenn. 2001) (finding adequate protection for use of cash collateral where, among other things, the debtors agreed to provide operating reports to the lender and permit inspection of the premises upon lender's reasonable request).

62.    In this case, the Debtors propose to provide ongoing reporting to TD Bank on Rent collections and disbursements in the form of the Debtors Monthly Operating Reports required by the Office of the United States Trustee.

**(v)  TD Bank Will be Provided Replacement Liens**

63.    The Order also provides adequate protection to TD Bank in the form of replacement liens in (the "Adequate Protection Liens") all of RVP, AET, and EB's property and assets (whether existing on the Petition Date or thereafter acquired), and any proceeds thereof. *See* 11 U.S.C. § 361(2) (providing for replacement liens as a form of adequate protection).  Such adequate protection is commonplace.  *See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); *In re Center Wholesale, Inc.*, 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor).

64.    Here, in addition to retaining its lien on the proceeds of Lots 1, 3 & 5, TD Bank is also being provided additional adequate protection in the form of Adequate Protection Liens on any other collateral which may be generated during the Cases to the extent there is any diminution in the value of TD Bank's security interests in Lots 1, 3 & 5.  *See, e.g., In re O'Connor*, 808 F.2d at 1396-98; *In re Center Wholesale, Inc.*, 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor).

65.    This replacement lien will allow TD Bank an extra measure of protection against the unencumbered value of the Debtors' Properties.

**C.    The Debtors are Entitled to an Accounting of Rents Collected under the Stipulation**

66.     TD Bank has been collecting all of the Debtors' rents since approximately December 2012.   Because the rents collected by TD Bank were the Debtors' pre-petition property, and are property of the Debtors' estates post-petition, TD Bank has a direct duty to account for such rents pursuant to Bankruptcy Code sections 542 and 543 of the Bankruptcy Code.

67.     The Debtors require a detailed accounting from TD Bank to determine how such collections were applied by TD Bank on account of the Debtors' obligations.   As noted above, the Debtors require this information to calculate the amount of the monthly interest payments to be made to TD Bank under the Budget.   Further, the Debtors require this information to determine the reasonableness of additional charges and costs which TD Bank has added to the Debtors' loan obligations.   Such an accounting from TD Bank will allow for a salutary review of TD Bank's claim to enable the Debtors to proceed with these chapter 11 reorganizations.

## NOTICE

68.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel for TD Bank; (iii) the Debtors' creditors and parties in interest; and (iv) any party requesting notice pursuant to Bankruptcy Rule 2002.   The Debtors submit that no other or further notice need be provided.

*WHEREFORE*, the Debtors respectfully request that the Court (a) enter of the Order granting the relief requested, including: (i) authorizing the Debtors' use of cash, including Cash Collateral, pursuant to the terms of the Order (including the Budget); (ii) finding that the interests of TD Bank are adequately protected; (iii) requiring TD Bank to provide a detailed accounting of all rents collected under the Leases; and (iv) granting related relief; and (b) grant to the Debtors such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         July 23, 2013

FOX ROTHSCHILD LLP
*Counsel to Richmond Valley Plaza,*
*LLC, A.E.T. Realty Holding Corp.,T.M. Real Estate*
*Holding LLC a/k/a T.M. Realty Holding Corp., and*
*E.B. Realty Holding Corp., Debtors and Debtors-*
*in-Possession*


By:   */s/ Yann Geron*
      Yann Geron
      Kathleen Aiello
      100 Park Avenue, 15th Floor
      New York, New York 10017
      (212) 878-7900